# NISHIKAWA *v.* DULLES, SECRETARY OF STATE.

No. 19.  Argued May 1–2, 1957.—Restored to the calendar for reargument June 24, 1957.—Reargued October 28, 1957.—Decided March 31, 1958.

*Fred Okrand* argued the cause for petitioner on the original argument, *A. L. Wirin* on the reargument, and both were on the briefs.

*Oscar H. Davis* argued the cause for respondent. With him on the briefs were *Solicitor General Rankin, Warren Olney, III,* then Assistant Attorney General, and *Beatrice Rosenberg. J. F. Bishop* was also with them on the brief on the reargument.

MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.

In this, the third of the denationalization cases decided today, issues concerning Section 401 (c) of the Nationality Act of 1940 are presented. That statute provides:

> "A person who is a national of the United States, whether by birth or naturalization, shall lose his nationality by:
>
> .        .        .        .        .
>
> "(c) Entering, or serving in, the armed forces of a foreign state unless expressly authorized by the laws of the United States, if he has or acquires the nationality of such foreign state . . . ." [1]

We need not in this case consider the constitutionality of Section 401 (c). This case thus differs from *Perez* v. *Brownell, ante,* p. 44, and *Trop* v. *Dulles, ante,* p. 86,

---

[1] 54 Stat. 1168, 1169. The present provision, Immigration and Nationality Act of 1952, § 349 (a) (3), 66 Stat. 267, 268, 8 U. S. C. § 1481 (a) (3), eliminates the necessity that the expatriate have or acquire the nationality of the foreign state.

where questions of the constitutionality of Sections 401 (e) and 401 (g) were determined. The issues with which we are concerned here relate solely to problems of burden of proof.

Petitioner brought this action in a District Court praying for a judgment declaring him to be a citizen of the United States. The controversy arose from petitioner's application to a United States Consulate in Japan for an American passport. Instead of the passport, he received more than a year later a Certificate of the Loss of the Nationality of the United States. Petitioner alone testified at the trial, the Government introducing no testimony. What follows is a summary of his testimony.

Petitioner was born in Artesia, California, in 1916. By reason of that fact, he was a citizen of the United States, and because of the citizenship of his parents, he was also considered by Japan to be a citizen of that country. Petitioner was educated in the schools of this country and lived here until 1939. In August of that year, having been graduated from the University of California with a degree in engineering, he went to Japan, intending to stay between two and five years, visiting and studying. He knew that his father had registered him in the family register in Japan. In November of 1939 petitioner's father, who was paying his way, died in this country and petitioner, lacking funds, went to work for an aircraft manufacturing company in Japan for the equivalent of $15 a month. He was unable to accumulate any savings. Pursuant to the Military Service Law of Japan, petitioner was required about June 1940 to take a physical examination, and on March 1, 1941, he was inducted into the Japanese Army. The Military Service Law provided for imprisonment for evasion. Between the time of his physical examination and his induction, petitioner did not protest his induction or attempt to renounce his

Japanese nationality, to return to the United States or to secure the aid of United States consular officials. He testified that he was told by a friend who worked at the American Embassy that the American Consulate could not aid a dual national; the Government has not contended that this was not so. He further testified that he had heard rumors about the brutality of the Japanese secret police which made him afraid to make any protest.

Petitioner testified that he did not know when he went to Japan that he was likely to be drafted. He said he was not aware at that time of any threat of war between the United States and Japan. He had left the United States just prior to the outbreak of war in Europe and two years and four months before Pearl Harbor. He testified that he was unable to read the Japanese language and lived too far out in the country to subscribe to an English-language newspaper, and therefore did not read any newspapers while in Japan.

Petitioner served as a maintenance man or mechanic in an Air Force regiment in China, Indo-China, the Philippines and Manchuria. He testified that when war between the United States and Japan began, he expressed the opinion to a group of noncommisioned officers that there was no chance of Japan's winning the war. That night he was given a thorough beating; he was beaten almost every day for a month, and afterwards he was beaten "a couple days a month." He won the nickname "America."

After hearing this testimony, the district judge announced from the bench that "the court simply does not believe the testimony of the witness. That is all. I simply do not believe his testimony." He went on to express his opinion that petitioner "went over because as a Japanese citizen under the laws of Japan it was necessary for him to serve his hitch in the army. . . . He went over and he waited until they reached him on the draft,

and when they did he was drafted." Formally, the court found as a fact on the basis of petitioner's testimony alone, which did not include an admission to that effect, that his "entry and service in the Japanese Armed Forces was his free and voluntary act." Therefore he was held to have lost his nationality under Section 401 (c) and judgment was rendered for respondent. The Court of Appeals for the Ninth Circuit affirmed that judgment.[2] We granted certiorari. 352 U. S. 907.

Whatever divergence of view there may be as to what conduct may, consistent with the Constitution, be said to result in loss of nationality, cf. *Perez* v. *Brownell, ante,* pp. 44, 62, it is settled that *no* conduct results in expatriation unless the conduct is engaged in voluntarily. *Mandoli* v. *Acheson,* 344 U. S. 133.[3] The Government does not contend otherwise. Likewise, the parties are agreed that when a citizenship claimant proves his birth in this country or acquisition of American citizenship in some other way, the burden is upon the Government to prove an act that shows expatriation by clear, convincing and unequivocal evidence. In *Gonzales* v. *Landon,* 350 U. S. 920, we held that the rule as to burden of proof in denaturalization cases[4] applied to expatriation cases under Section 401 (j) of the Nationality Act of 1940. We now conclude that the same rule should govern cases under all the subsections of Section 401.

The parties disagree as to whether the Government must also prove that the expatriating act was voluntarily performed or whether the citizenship claimant bears the

---

[2] 235 F. 2d 135.

[3] See also, *e. g., Acheson* v. *Murata,* 342 U. S. 900; *Acheson* v. *Okimura,* 342 U. S. 899; *Dos Reis ex rel. Camara* v. *Nicolls,* 161 F. 2d 860; 41 Op. Atty. Gen., No. 16.

[4] *Baumgartner* v. *United States,* 322 U. S. 665; *Schneiderman* v. *United States,* 320 U. S. 118.

burden of proving that his act was involuntary.[5]  Petitioner contends that voluntariness is an element of the expatriating act, and as such must be proved by the Government.  The Government, on the other hand, relies upon the ordinary rule that duress is a matter of affirmative defense and contends that the party claiming that he acted involuntarily must overcome a presumption of voluntariness.

Because the consequences of denationalization are so drastic petitioner's contention as to burden of proof of voluntariness should be sustained.  This Court has said that in a denaturalization case, "instituted . . . for the purpose of depriving one of the precious right of citizenship previously conferred we believe the facts and the law should be construed as far as is reasonably possible in favor of the citizen."  *Schneiderman* v. *United States,*

---

[5] *Gonzales* v. *Landon,* 350 U. S. 920; *Acheson* v. *Murata,* 342 U. S. 900, and *Acheson* v. *Okimura,* 342 U. S. 899, are not dispositive of the issue.  The holding in *Gonzales* went to the Government's burden of proof in general without specific regard to voluntariness. *Murata* and *Okimura* came here on appeal from a District Court's holding that various subsections of § 401 were unconstitutional.  99 F. Supp. 587, 591.  We remanded for specific findings as to the circumstances attending the alleged acts of expatriation and the reasonable inferences to be drawn therefrom.

In *Bruni* v. *Dulles,* 98 U. S. App. D. C. 358, 235 F. 2d 855, the Court of Appeals for the District of Columbia Circuit considered *Gonzales* as requiring the Government to prove voluntariness by clear, convincing and unequivocal evidence.  *Lehmann* v. *Acheson,* 206 F. 2d 592, can also be read as placing that burden on the Government.  It is clear, at least, that the Third Circuit, *Lehmann* v. *Acheson, supra; Perri* v. *Dulles,* 206 F. 2d 586, as well as the Second Circuit, *Augello* v. *Dulles,* 220 F. 2d 344, regards conscription as creating a presumption of involuntariness which the Government must rebut.  The Court of Appeals for the District of Columbia Circuit took a contrary view prior to *Bruni* v. *Dulles, supra.  Alata* v. *Dulles,* 95 U. S. App. D. C. 182, 221 F. 2d 52; *Acheson* v. *Maenza,* 92 U. S. App. D. C. 85, 202 F. 2d 453.

320 U. S. 118, 122.[6]   The same principle applies to expatriation cases, and it calls for placing upon the Government the burden of persuading the trier of fact by clear, convincing and unequivocal evidence that the act showing renunciation of citizenship was voluntarily performed. While one finds in the legislative history of Section 401, and particularly Section 401 (c), recognition of the concept of voluntariness,[7] there is no discussion of the problem of the burden of proof.   What is clear is that the House Committee which considered the bill rejected a proposal to enact a conclusive presumption of voluntariness in the case of dual nationals entering or serving in the military forces of the nation of their second nationality.[8]   It is altogether consonant with this history to

[6] See also *United States* v. *Minker*, 350 U. S. 179, 197 (concurring opinion): "When we deal with citizenship we tread on sensitive ground."

[7] See Hearings before the House Committee on Immigration and Naturalization on H. R. 6127, superseded by H. R. 9980, 76th Cong., 1st Sess. 150, 201.

[8] The proposal was advanced by the State Department spokesman, Mr. Flournoy, who said:

"If a man is a citizen of the United States and Japan, both countries, as he would be in all of these cases we have been discussing, and he is living in Japan, and he reaches the military age, and they call him for service, it should not make any difference from our point of view whether he makes a protest or not.   It is his duty to serve. He is in that country, and he is a citizen of that country, and if we accept his plea of duress in these cases it practically nullifies the whole thing, so we should put a proviso in reading somewhat as follows: That if an American national also has the nationality of a foreign country and is residing therein at a time when he reaches the age for liability of military service his entry into the armed forces thereof shall be presumed to be voluntary.   In other words, a plea of duress would not make any difference.   He is a citizen of that country, and he is presumed to know that when the time comes he will have to serve."   *Id.*, at 150.

Spokesmen for the Labor and Justice Departments objected, stating that dual nationals should have the opportunity to be heard on

place upon the Government the burden of proving voluntariness. The Court has said that "Rights of citizenship are not to be destroyed by an ambiguity." *Perkins* v. *Elg,* 307 U. S. 325, 337. The reference was to an ambiguity in a treaty, but the principle there stated demands also that evidentiary ambiguities are not to be resolved against the citizen.

Finally, the Government contends that even if it has the burden of proving voluntariness by clear, convincing and unequivocal evidence, that burden has been met in this case. What view the District Court took of the burden of proof does not clearly appear. The Court of Appeals seemed at one point to accept the evidence in the District Court as sufficient even on the view of the burden of proof as above stated.[9] That conclusion is not supportable. Of course, the citizenship claimant is subject to the rule dictated by common experience that one ordinarily acts voluntarily. Unless voluntariness is put in issue, the Government makes its case simply by proving the objective expatriating act. But here petitioner showed that he was conscripted in a totalitarian country to whose conscription law, with its penal sanctions, he was subject. This adequately injected the issue of voluntariness and required the Government to sustain its burden

the question of duress. *Id.,* at 150–156; 169–170; 200–203. At the time of the hearings § 401 (c) was not limited to dual nationals. The Senate Committee inserted the limitation. See 86 Cong. Rec. 12817.

The Court of Appeals for the First Circuit has correctly concluded that little significance attaches to the failure of the House Committee to accept a suggestion that the word "voluntarily" be inserted in subsections (b) through (g) of § 401. Hearings, *supra,* at 397–398. "It seems to us that the failure of the committee to accept this amendment is of little significance in view of the legislative history . . . indicating that such amendment was unnecessary and superfluous." *Dos Reis ex rel. Camara* v. *Nicolls,* 161 F. 2d 860, 864, n. 4.

[9] 235 F. 2d, at 140. But see *id.,* at 141.

of proving voluntary conduct by clear, convincing and unequivocal evidence.[10] The Government has not sustained that burden on this record. The fact that petitioner made no protest and did not seek aid of American officials—efforts that, for all that appears, would have been in vain—does not satisfy the requisite standard of proof. Nor can the district judge's disbelief of petitioner's story of his motives and fears fill the evidentiary gap in the Government's case. The Government's only affirmative evidence was that petitioner went to Japan at a time when he was subject to conscription.

On this record the Government has not established the voluntary conduct that is the essential ingredient of expatriation. The fact that this petitioner, after being conscripted, was ordered into active service in wartime on the side of a former enemy of this country must not be permitted to divert our attention from the necessity of maintaining a strict standard of proof in all expatriation cases. When the Government contends that the basic right of citizenship has been lost, it assumes an onerous burden of proof. Regardless of what conduct is alleged

---

[10] Petitioner's evidence of conscription also dispelled the presumption created by § 402 of the Nationality Act of 1940, 54 Stat. 1169, that a national who remains six months or more within the country of which either he or his parents have been nationals, has expatriated himself under § 401 (c) or (d). Even if valid, "Section 402 does not enlarge § 401 (c) or (d)," *Kawakita* v. *United States,* 343 U. S. 717, 730, and, like the analogous provision of § 2 of the Act of March 2, 1907, 34 Stat. 1228, it creates "a presumption easy to preclude, and easy to overcome." *United States* v. *Gay,* 264 U. S. 353, 358. The ambiguous terms of § 402 have since been superseded by § 349 (b) of the Immigration and Nationality Act of 1952, 66 Stat. 268, 8 U. S. C. § 1481 (b), which establishes a conclusive presumption of voluntariness on the part of a dual national who performs an expatriating act if he had resided in the state of his second nationality an aggregate of ten years or more immediately prior thereto. Of course, the new statutory presumption is not in issue in this case and there is no need to consider its validity.

to result in expatriation, whenever the issue of voluntariness is put in issue, the Government must in each case prove voluntary conduct by clear, convincing and unequivocal evidence.

The judgment of the Court of Appeals is reversed and the cause is remanded to the District Court for further proceedings consistent with this opinion.

*Reversed and remanded.*

MR. JUSTICE BLACK, with whom MR. JUSTICE DOUGLAS joins.

While I concur in the opinion of the Court I add the following to state what I conceive to be the controlling constitutional principles in this and other expatriation cases.

The Fourteenth Amendment declares that "All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." Nishikawa was born in this country while subject to its jurisdiction; therefore American citizenship is his constitutional birthright. See *United States* v. *Wong Kim Ark,* 169 U. S. 649. What the Constitution has conferred neither the Congress, nor the Executive, nor the Judiciary, nor all three in concert, may strip away. Although Congress can enact laws punishing those who shirk their duties as citizens or those who jeopardize our relations with foreign countries it cannot involuntarily expatriate any citizen. As THE CHIEF JUSTICE and MR. JUSTICE DOUGLAS explain in their dissenting opinions in *Perez* v. *Brownell, ante,* pp. 62, 79, this results not only from the provisions of the Fourteenth Amendment but from the manner in which the Government of the United States was formed, the fundamental political principles which underlie its existence, and its continuing relationship to the citizenry who

erected and maintain it. Cf. *Osborn* v. *Bank of the United States,* 9 Wheat. 738, 827. In my view the notion that citizenship can be snatched away whenever such deprivation bears some "rational nexus" to the implementation of a power granted Congress by the Constitution is a dangerous and frightening proposition. By this standard a citizen could be transformed into a stateless outcast for evading his taxes, for fraud upon the Government, for counterfeiting its currency, for violating its voting laws and on and on *ad infinitum.*

Of course a citizen has the right to abandon or renounce his citizenship and Congress can enact measures to regulate and affirm such abjuration. But whether citizenship has been voluntarily relinquished is a question to be determined on the facts of each case after a judicial trial in full conformity with the Bill of Rights. Although Congress may provide rules of evidence for such trials, it cannot declare that such equivocal acts as service in a foreign army, participation in a foreign election or desertion from our armed forces, establish a conclusive presumption of intention to throw off American nationality. Cf. *Tot* v. *United States,* 319 U. S. 463. Of course such conduct may be highly persuasive evidence in the particular case of a purpose to abandon citizenship.

To the extent that *Mackenzie* v. *Hare,* 239 U. S. 299, and *Savorgnan* v. *United States,* 338 U. S. 491, applied principles contrary to those expressed in this opinion I believe they are inconsistent with the Constitution and cannot be regarded as binding authority.

Mr. Justice Frankfurter, whom Mr. Justice Burton joins, concurring in the result.

This case involves a native-born citizen of Japanese parentage who has been declared to have lost his citizenship by virtue of § 401 (c) of the Nationality Act of 1940,

54 Stat. 1137, 1169, for having served in the Japanese armed forces while subject to the law of Japan making failure to serve a crime. That is the case before the Court. The defined issue raised by this case is the only issue, in my judgment, that the Court should decide.

Petitioner asserts that his service in the Japanese forces was performed under duress. His claim of duress is based on the fact that he was inducted into the Japanese armed forces pursuant to the compulsory conscription law of that country,[1] and that rumors of harsh punishment of draft evaders by the secret police and the ruthlessness of the government in power made him afraid to take any action to avoid service. The evidence to rebut this testimony, elicited on cross-examination, was that he had failed to take certain actions to avoid service; the only affirmative act urged in support of the voluntariness of his entry into service is that he went to Japan when he was of draft-eligible age[2] and remained there until inducted.

It is common ground that conduct will result in expatriation only if voluntarily performed. See *Mackenzie* v. *Hare,* 239 U. S. 299, 311–312; cf. *Acheson* v. *Okimura,* 342 U. S. 899; *Acheson* v. *Murata,* 342 U. S. 900. Accordingly, where a person who has been declared expatriated contests that declaration on grounds of duress, the evidence in support of this claim must be sympathetically scrutinized. This is so both because of the extreme gravity of being denationalized and because of the subtle, psychologic factors that bear on duress.

---

[1] According to a stipulation of the parties in the record, the Military Service Law of Japan provided punishment of up to three years of penal servitude for persons evading military service.

[2] There does not seem to be any explicit basis in the record for the trial court's finding (Finding of Fact No. III) that petitioner made the trip to Japan "knowing at that time that he was likely to be called for military service in the Japanese Armed Forces."

The issue that is ultimately decisive in a litigation is one thing, the mode for determining it quite another. The fact that conduct, in order to result in loss of citizenship, must be voluntary behavior does not inherently define the appropriate manner of its proof. The Government properly has a very heavy burden in expatriation cases: it must establish that the citizen committed an "act of expatriation"—*i. e.*, engaged in conduct of which the consequence is loss of citizenship—by clear, convincing and unequivocal evidence. *Gonzales* v. *Landon,* 350 U. S. 920, adopting the standard of *Schneiderman* v. *United States,* 320 U. S. 118, and *Baumgartner* v. *United States,* 322 U. S. 665. This is incumbent on the Government although the evidence in cases such as these may well be difficult to obtain. Much more difficult would it be for the Government to establish the citizen's state of mind as it bears on his will, purpose and choice of action— in short, "voluntariness." According to the ordinarily controlling principles of evidence, this would suggest that the individual, who is peculiarly equipped to clarify an ambiguity in the meaning of outward events, should have the burden of proving what his state of mind was. See *Selma, Rome & Dalton R. Co.* v. *United States,* 139 U. S. 560, 567–568. Moreover, any other evidence of his state of mind, outside of his own mental disclosures, will often be found only abroad, where the Government may have no facilities for conducting the necessary investigation. The Court should hesitate long before imposing on the Government, by a generalized, uncritical formula, a burden so heavy that the will of Congress becomes incapable of sensible, rational, fair enforcement.

Where an individual engages in conduct by command of a penal statute of another country to whose laws he is subject, the gravest doubt is cast on the applicability of the normal assumption—even in a prosecution for murder (see *Leland* v. *Oregon,* 343 U. S. 790)—that what

a person does, he does of his own free will. When a consequence as drastic as denationalization may be the effect of such conduct, it is not inappropriate that the Government should be charged with proving that the citizen's conduct was a response, not to the command of the statute, but to his own direction. The ready provability of the critical fact—existence of an applicable law, particularly a criminal law, commanding the act in question—provides protection against shifting this burden to the Government on the basis of a frivolous assertion of the defense of duress. Accordingly, the Government should, under the circumstances of this case, have the burden of proving by clear, convincing and unequivocal evidence that the citizen voluntarily performed an act causing expatriation.

Since the courts below were not guided by this formulation, the judgment should not be allowed to stand. However, the Government should not be denied a further opportunity to bring forward the necessary proof if it is able to do so. Whether, in other classes of cases in which the defense of duress is asserted, the Government should have the burden of proving its absence is a question the Court need not—and, therefore, should not—reach. For that reason, I concur in the result announced but cannot join the opinion of the Court.

MR. JUSTICE HARLAN, whom MR. JUSTICE CLARK joins, dissenting.

The central question in this case is simply whether Nishikawa's service in the Japanese Army can be said to be "voluntary" when the record contains virtually nothing more in the way of proof than that he went to Japan from this country in 1939 and was inducted into the army pursuant to a conscription law of Japan without any protest on his part.

Beyond establishing that he was drafted without protest, Nishikawa's testimony should be disregarded, for the

District Court expressly stated that it disbelieved his explanations as to why he had not sought the aid of American authorities in Japan or otherwise attempted to protest or prevent his induction, and the Court of Appeals has affirmed. Particularly when credibility is in issue we should not set ourselves against the factual determinations of the trial court, which had the great advantage of hearing and observing Nishikawa on the witness stand.

The Courts of Appeals have divided on the question whether proof of conscription, in the absence of anything more on either side, precludes a finding that service in a foreign army was voluntary. The Second and Third Circuits have held that it does. *Augello* v. *Dulles,* 220 F. 2d 344; *Lehmann* v. *Acheson,* 206 F. 2d 592; *Perri* v. *Dulles,* 206 F. 2d 586. The District of Columbia Circuit has ruled that "[d]uress cannot be inferred from the mere fact of conscription." *Acheson* v. *Maenza,* 92 U. S. App. D. C. 85, 90, 202 F. 2d 453, 458; *Alata* v. *Dulles,* 95 U. S. App. D. C. 182, 221 F. 2d 52; but see *Bruni* v. *Dulles,* 98 U. S. App. D. C. 358, 235 F. 2d 855.[1]

Moved by the consideration that a contrary rule would lead to the "drastic" consequence of denationalization, the Court holds that (1) the fact that Nishikawa was conscripted into the Japanese Army precluded the District Court from finding that his service was voluntary, in the absence of the Government's showing something more than that he failed to take any steps to prevent or protest his induction; and (2) the Government has the burden of proving voluntariness in all denationalization cases once the issue of duress has been "injected" into the

---

[1] See also *Hamamoto* v. *Acheson,* 98 F. Supp. 904. Compare *Acheson* v. *Okimura,* 342 U. S. 899; *Acheson* v. *Murata,* 342 U. S. 900, and the dissenting opinion in *Mandoli* v. *Acheson,* 344 U. S. 133, 139. As we read *Gonzales* v. *Landon,* 350 U. S. 920, cited in the majority opinion, that case related simply to the *standard,* and not to the *burden,* of proof in denationalization cases.

case.  I too am not insensitive to the high value of American citizenship, but find myself compelled to dissent because in my opinion the majority's position can be squared neither with congressional intent nor with proper and well-established rules governing the burden of proof on the issue of duress.

## I.

To permit conscription without more to establish duress unjustifiably limits, if it does not largely nullify, the mandate of § 401 (c).  By exempting from the reach of the statute all those serving in foreign armies as to whom no more has been shown than their conscription, the Court is attributing to Congress the intention to permit many Americans who served in such armies to do so with impunity.  There is no solid basis for such a restrictive interpretation.  By the time the Nationality Act of 1940 was passed, conscription and not voluntary enlistment had become the usual method of raising armies throughout the world, and it can hardly be doubted that Congress was aware of this fact.  In view of this background it is farfetched to assume that Congress intended the result reachéd by the Court, a result plainly inconsistent with the even-handed administration of § 401 (c).  Moreover, the very terms of the section, which refer to both "entering" and "serving in" foreign armed forces, are at odds with such an intention.

## II.

Although the Court recognizes the general rule that consciously performed acts are presumed voluntary, see 3 Wigmore, Evidence (3d ed.), § 860; Fed. Rules Civ. Proc., 8 (c), it in fact alters this rule in *all* denationalization cases by placing the burden of proving voluntariness on the Government, thus relieving citizen-claimants in

such cases from the duty of proving that their presumably voluntary acts were actually involuntary.[2]

One of the prime reasons for imposing the burden of proof on the party claiming involuntariness is that the evidence normally lies in his possession. This reason is strikingly applicable to cases of the kind before us, for evidence that an individual involuntarily served in a foreign army is peculiarly within his grasp, and rarely accessible to the Government. Nishikawa's case amply illustrates the proposition. In the eight months that passed between his notice to report for a physical examination and his actual induction Nishikawa could have taken a variety of steps designed to prevent his conscription, any of which would have been persuasive evidence of the involuntary character of his service. For example, he could have sought to return to the United States, to renounce his Japanese nationality, to advise Japanese officials that he was an American citizen, to enlist the assistance of American Consular officials in

---

[2] The Court not only reaches a conclusion inconsistent with the usual rules governing burden of proof, but does so in the face of § 402 of the Nationality Act, which provides in part:

"A national of the United States who was born in the United States . . . shall be presumed to have expatriated himself under subsection (c) or (d) of section 401, when he shall remain for six months or longer within any foreign state of which he or either of his parents shall have been a national according to the laws of such foreign state . . . and such presumption shall exist until overcome whether or not the individual has returned to the United States." 54 Stat. 1137, 1169.

Nishikawa was in Japan for 10 months before he even received notice to report for physical examination in the draft. He was inducted over 18 months after his arrival in Japan. This Court held in *Kawakita* v. *United States,* 343 U. S. 717, 730: "Section 402 does not enlarge § 401 (c) or (d); it creates a rebuttable presumption of expatriation; and when it is shown that the citizen did no act which brought him under § 401 (c) or (d), the presumption is overcome."

Japan, or to employ the aid of friends or relatives in the United States.[3] Nishikawa admits that he did none of these things. But if he claimed that he had, is it not apparent that he and not the Government is the logical party to bring forward the pertinent evidence? In such circumstances it seems to me the better course to require Nishikawa to prove his allegation of duress rather than to impose on the Government the well-nigh impossible task of producing evidence to refute such a claim.

For both of the reasons set forth above I think that the finding of the District Court that Nishikawa served in the Japanese Army without duress should not be disturbed.

In considering § 401 (c), we ought not to lose sight of the fact that it deals solely with dual nationals, remitting them to the citizenship of the country which they served in time of war. Unlike the majority, I do not believe that this consequence is incommensurate with petitioner's conduct. It seems to me that there is a large measure of justice in relegating Nishikawa solely to his Japanese citizenship, for it is with the armed forces of Japan that he served for more than four years during the heart of the late World War. Nishikawa's service included participation in military action against the United States in the Philippines. There is no suggestion that at any time during this period he ever performed any act indicating disloyalty to Japan or loyalty to the United States.

The Court remands the case presumably to give the Government the opportunity to show that Nishikawa's service with the Japanese Army was voluntary. Surely this is but an empty gesture. The Government can

---

[3] It is of course quite irrelevant that any steps taken by Nishikawa to forestall his induction may have been in vain. Whether successful or not, they would certainly have reflected his unwillingness to serve in the Army of Japan.

hardly be expected to adduce proof as to occurrences taking place in Japan more than 17 years ago which are now shrouded in obscurity beyond serious hope of detection.

Nishikawa's constitutional contention that Congress lacked power to enact § 401 (c) is, in my view, foreclosed by *Perez* v. *Brownell, ante,* p. 44, decided this day.

I would affirm the judgment of the Court of Appeals.