**Thomas T. MOLDOVEANU, Plaintiff,**

v.

**John Foster DULLES, Secretary of State,
Defendant.**

**Civ. A. No. 15717.**

United States District Court
E. D. Michigan, S. D.

Nov. 10, 1958.

Hudson Mead, Burgess & Mead, Detroit, Mich., Harry Kobel, Detroit, Mich., of counsel, for plaintiff.

Fred W. Kaess, U. S. Atty., John L. Owen, Asst. U. S. Atty., Detroit, Mich., for defendant.

LEVIN, District Judge.

Petitioner, a citizen of the United States by birth, and a resident of this judicial district, having been denied a passport on the ground that he expatriated himself from United States citizenship, brings this action under the authority of Section 360(a) of the Immigration and Nationality Act of 1952;

8 U.S.C.A. § 1503(a),[1] praying for a judgment declaring him to be a national of the United States.

Plaintiff, on November 21, 1955, submitted an application for a United States passport to the State Department. In 1956 his application was denied on the ground that he had expatriated himself by taking an oath of allegiance to the Government of Rumania. Section 2 of the Act of March 2, 1907; 34 Stat. 1228; 8 U.S.C. § 17.[2]

The Government contends that in addition to the ground relied on by the State Department in denying a passport to plaintiff in 1956, the plaintiff has expatriated himself by voting in a foreign political election (Section 401(e) of the Nationality Act of 1940; 54 Stat. 1169; 8 U.S.C. § 801(e))[3] and by failure to comply with Section 401(a) of the Nationality Act of 1940; 54 Stat. 1168–1169; 8 U.S.C. § 801;[4] which provides

1. Section 360(a) of the Immigration and Nationality Act of 1952; 8 U.S.C.A. § 1503(a) provides in pertinent part as follows:

"If any person who is within the United States claims a right or privilege as a national of the United States and is denied such right or privilege by any department or independent agency, or official thereof, upon the ground that he is not a national of the United States, such person may institute an action under the provisions of section 2201 of Title 28, against the head of such department or independent agency for a judgment declaring him to be a national of the United States, * * *. An action under this subsection may be instituted only within five years after the final administrative denial of such right or privilege and shall be filed in the district court of the United States for the district in which such person resides or claims a residence, and jurisdiction over such officials in such cases is conferred upon those courts."

2. Section 2 of the Act of March 2, 1907 provides:

"That any American citizen shall be deemed to have expatriated himself when he has been naturalized in any foreign state in conformity with its laws, or when he has taken an oath of allegiance to any foreign state."

3. Section 401 of the Nationality Act of

1940 provides that a person who is a national of the United States, whether by birth or naturalization, shall lose his nationality by:

"(e) Voting in a political election in a foreign state or participating in an election or plebiscite to determine the sovereignty over foreign territory (54 Stat. 1169; 8 U.S.C. § 801)."

4. Section 401 of the Naturalization Act of 1940 provides in pertinent part that a person who is a national of the United States, whether by birth or naturalization, shall lose his nationality by:

"(a) Obtaining naturalization in a foreign state, either upon his own application or through the naturalization of a parent having legal custody of such person: * * * Provided further, That a person who has acquired foreign nationality through the naturalization of his parent or parents, and who at the same time is a citizen of the United States, shall, if abroad and he has not heretofore expatriated himself as an American citizen by his own voluntary act, be permitted within two years from the effective date of this Act to return to the United States and take up permanent residence therein, and it shall be thereafter deemed that he has elected to be an American citizen. Failure on the part of such person to so return and take up permanent residence in the United States during such period shall be deemed

for denationalization of a national who acquires foreign nationality through the naturalization of his parents and who did not return to the United States and take up residence as a citizen of the United States within two years after January 13, 1941, the effective date of the Act.

Plaintiff was born in Ohio on June 20, 1908. Some time in 1911 or 1912 he was taken by his parents to Sebesul-de-jos, Transylvania, the place of their birth. At the time of his arrival, this province was part of the Austro-Hungarian Empire but was ceded to Rumania at the conclusion of World War I. Between 1923 and 1926, before he attained his majority, plaintiff made inquiry at the United States Consulate at Bucharest about returning to the United States and was told that a minor would not be granted permission to return to the United States alone. In 1929, at the age of 21, plaintiff was informed by the Rumanian Government that he was being conscripted into the military service. He protested unsuccessfully that he was an American citizen and therefore not subject to military service of a foreign government. He also attempted to secure the aid and intervention of the American Consulate in order to return to the United States but was told by a consular official that nothing could be done for him since he had lived for so long a time in Rumania. He obtained several military deferments to permit him to continue his studies but was finally inducted into the Rumanian Army in 1932 and served until some time in 1933. A few months after he reported for duty, an oral oath of allegiance, the wording of which he had no recollection, was administered to him and to other recruits in a mass ceremony. In the summer of 1939 he again made inquiry of the

American Consulate about securing a passport to return to the United States but was refused on the ground that he had expatriated himself by taking the oath of allegiance to the Rumanian Government while in service. On March 2, 1941 he participated in a Rumanian plebiscite held to permit the Rumanian nation to express its approval or disapproval of the manner in which General Antonescue had governed the country since September 6, 1940.

In 1939 he obtained a visitor's visa for entry into the United States in order to clarify his citizenship status and for business purposes. Shortly after his entry into the United States, World War II broke out and he returned to his family in Rumania without having accomplished either of his stated purposes. In 1941 and 1946 he again tried unsuccessfully to secure an American passport.

In 1948 he escaped from Rumania to France. On January 10, 1949 he entered the United States as a visitor with a French Certificate of Identity under Section 3(2) of the Immigration Act of 1924.* Permanent residence was granted to plaintiff in 1952 by Concurrent Resolution of Congress,[5] pursuant to the Displaced Persons Act of 1948, 50 U.S.C.A.Appendix, § 1953.[6]

In Nishikawa v. Dulles, 356 U.S. 129, 78 S.Ct. 612, 2 L.Ed.2d 659, the Supreme Court held that when a citizenship claimant proves his birth in the United States, it then devolves upon the Government to prove any alleged expatriating acts by clear, convincing and unequivocal evidence, and that, in addition, whenever the voluntariness of the citizen's conduct is put in issue, the Government has the burden of showing by the same evidentiary standard that the alleged ex-

---

to be a determination on the part of such person to discontinue his status as an American citizen, and such person shall be forever estopped by such failure from thereafter claiming such American citizenship." (54 Stat. 1168-1169; 8 U.S.C. § 801) now 8 U.S.C.A. § 1481(a).

* Now 8 U.S.C.A. § 1101(a) (15) (C).

5. Congressional Record, 82nd Congress, Second Session, Volume 98, No. 117, Pages 8901, 8902.

6. The Displaced Persons Act of 1948, 50 U.S.C.A.Appendix, § 1953, provides for the adjustment of the immigration status of aliens who entered the United States prior to April 30, 1949.

patriating act or acts were performed voluntarily.

 It is in this light that the evidence relating to petitioner's alleged expatriating acts must be evaluated.

I shall first consider the Government's contention that plaintiff expatriated himself under Section 2 of the Act of March 2, 1907 when he took the oath of allegiance to the Rumanian Government while in military service.

Under Rumanian law, in force at the time plaintiff was conscripted, all persons residing in Rumania between the ages of 19 to 47 were subject to military service and any attempt to avoid service was punishable. 3 Hackworth, Digest of International Law at page 190 (1942).

██ Plaintiff testified that he was aware that severe penalties were imposed upon those who sought to avoid military service; and, as appears earlier in this opinion, not only did he protest to the Rumanian authorities that as an American citizen he was not required to serve in the Rumanian army, but he also sought aid from the American Consulate in Bucharest. The Government offered no evidence in rebuttal but places its sole reliance upon the act of the oath taking. On the record before me I find that the plaintiff did not enter voluntarily the military service of Rumania.

 Where military service in a foreign country is compulsory, the taking of the oath in connection therewith is also, in absence of evidence to the contrary, presumed to be involuntary. Augello v. Dulles, 2 Cir., 220 F.2d 344. There is no evidence to rebut the presumption that the oath of allegiance was taken under duress. To the extent that the Government relies on Section 2 of the Act of March 2, 1907 it must fail.

The Government's contention that expatriation took place under Section 401 (e) when plaintiff participated in the plebiscite of March 2, 1941 is also without merit. Section 401(e) provides two grounds for expatriation; namely, "voting in a political election" and "participating in an election or plebiscite to determine sovereignty over foreign territory." Since the plebiscite in which plaintiff participated did not involve a determination of sovereignty over foreign territory, the questions before me are whether plaintiff by participating in the plebiscite of March 2, 1941 voted in a political election, and, if he did, whether such participation was voluntary.

██ A political election may be defined as the act of choosing by vote a person to fill an office associated with the conduct of government; whereas, a plebiscite is "a vote or decree of the people (now usually by universal suffrage) or some measure submitted to them by some person or body having the initiative, as where the referendum is employed." Webster's New International Dictionary (Unabridged) 2d Ed. 1954. The drafters of Section 401(e) recognized this difference. When they desired to make participation in a plebiscite a basis for expatriation, they did so. In this context it is clear that participation in the plebiscite of March 2, 1941 did not constitute voting in a political election within the meaning of Section 401(e).

██ It is also to be noted that not only was no choice given to the electorate to vote for candidates for office, which is a prime requisite of a political election, but the professed opportunity given to approve or disapprove the policies of the Antonescue government was in reality nonexistent. Free expression of the will of the electorate was impossible. Meetings and speeches to discuss and evaluate the policies of the Government were prohibited. There was no provision for a secret ballot but the voters were to openly vote "Yes" or "No" before local commissions. Significant in this respect is the fact that but one tenth of one percent of the voters expressed their disapproval. The plebiscite was merely a device to secure coerced approbation of a course of conduct. It was not a political election.

██ Moreover, even if it be assumed that the plebiscite was a political election, plaintiff did not expatriate himself

by participation in the plebiscite inasmuch as his participation was not voluntary. The plebiscite decree provided that "All Rumanians of any occupation who have attained the age of 21 are obliged to vote." (Article III) And added that the failure to vote would be "punished by five years of hard labor." (Article VII)

Plaintiff testified that he knew he was required to participate in the plebiscite, that he was aware that sanctions were imposed for noncompliance and that he feared the consequences that might ensue if he did not comply.

The compulsory character of the plebiscite was officially recognized by the United States Government. In a letter addressed to the Secretary of State, March 17, 1941, an official of the American Legation in Bucharest, after stating that an appreciable segment of the Rumanian population had indicated that it would not participate in the plebiscite, noted that 99.9 percent of the people did participate, and then commented that "I have the impression that probably a substantial share of the rank and file of the Party [7] did participate in the plebiscite because of its compulsory character and the fear that non-voters would be penalized."

Plaintiff's participation was compelled by the order of a government exercising unrestrained power over its constituents. Participation so secured can hardly be termed voluntary. In this setting, any choice that plaintiff may be said to have had was in fact no choice at all.

It is also the contention of the Government that since the plaintiff acquired foreign nationality through the nationalization of his parents and failed to return to the United States prior to January 13, 1943, he was expatriated under the provisions of Section 401(a) of the Nationality Act of 1940.

This contention rests on the Government's conclusion that plaintiff's father was naturalized under Article 56 of the Rumanian Nationality Law of 1924, which provides that:

"The following classes of inhabitants are and remain Rumanian citizens without further obligation on their part, if, until the date of the promulgation of the present law, they have not opted for another nationality:

"(1) All inhabitants of Bukowina, Transylvania, the Banat, Crisana, Satmar and Maramures who had a legal residence on December 1, 1918 (November 18th, Gregorian Calendar)"

and that plaintiff acquired Rumanian citizenship as a result of his father's naturalization in accordance with provision of Article 57 of that law, which states that if a parent obtains Rumanian nationality under Article 56, "the nationality is vested also in the wife and children under parental jurisdiction."

However, at the hearing before me, an expert on Rumanian law testified that plaintiff's father became a national of Rumania, not pursuant to the Rumanian Nationality Law of 1924, but by virtue of Article 4 of the Treaty of Paris of December 9, 1919, of which the British Empire, France, Italy, Japan, the United States of America, and Rumania, were signatories. Article 4 of the Treaty of Paris does not contain a provision similar to Article 57 of the Rumanian Nationality Law of 1924. Since the plaintiff's father obtained nationality under the Treaty of Paris and not pursuant to the Rumanian Nationality Law, such nationalization did not impose derivative citizenship on the plaintiff. It therefore follows that the plaintiff did not obtain "naturalization in a foreign state, either upon his own application, or through naturalization of a parent having legal custody of such person." Accordingly, there was no obligation imposed upon the plaintiff to return to the United States by Section 401(a).

---

**7.** The reference to "party" refers to the National Peasant Party, whose leaders officially expressed an intention to abstain from participation in the plebiscite vote.

In any event, Section 401 (a) is complied with if a citizen makes a timely application for return. "The statutory time limitation applies to the application by the plaintiff for the permission to come to the United States to live and not to the time of his actual arrival here." Perri v. Dulles, 3 Cir., 206 F.2d 586, 591. The testimony establishes without contradiction that the plaintiff made continuous efforts to return to the United States. He made an attempt to return before he reached his 21st birthday; another attempt was made in 1932 prior to his induction into the armed forces of Rumania, and attempts were also made in 1939, 1941, and 1946. Plaintiff did all that reasonably could be required of him. Simple justice requires that the defense of non-compliance with the provisions of Section 401(a) be unavailable to the Government when its own restraint induced the failure to return.

A judgment shall be entered declaring the plaintiff to be a citizen of the United States.