**Rabbi Meir KAHANE, Plaintiff,**

v.

**George P. SHULTZ, Secretary of State and Edwin Meese, Attorney General, Defendants.**

**No. 85 Civ. 3754.**

United States District Court, E.D. New York.

Feb. 21, 1987.

the Administration. *See Keppler v. Heckler, supra* 587 F.Supp. at 1324.

Burt Neuborne, Jack D. Novik, American Civil Liberties Union Foundation, Barry Slotnick, New York City, for plaintiff.

Robert L. Begleiter, Asst. U.S. Atty. (Andrew J. Maloney, U.S. Atty., of counsel), Brooklyn, New York, for defendants.

## MEMORANDUM AND ORDER

GLASSER, District Judge:

■ "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States...." U.S. Const. amend. XIV, § 1. In this case, the court must decide whether the plaintiff, Rabbi Meir Kahane, has lost the precious right of American citizenship. The government must prove three things if Kahane is to be deprived of his citizenship:

(1) that he committed an expatriating act, as defined by statute;

(2) that he did so voluntarily; and

(3) that he intended to relinquish his citizenship.

■ The parties agree that Kahane has committed an expatriating act, because he accepted a seat in the parliament of a foreign state, the Israeli Knesset. *See* 8 U.S.C. § 1481(a)(4)(A). The parties also agree that Kahane performed the expatri-

ating act voluntarily, as required by *Nishikawa v. Dulles*, 356 U.S. 129, 133, 78 S.Ct. 612, 615, 2 L.Ed.2d 659 (1958). The only dispute between the parties is whether Kahane "intended to relinquish his citizenship," as required by *Vance v. Terrazas*, 444 U.S. 252, 261, 100 S.Ct. 540, 545, 62 L.Ed.2d 461 (1980).

The State Department's Board of Appellate Review found that Kahane intended to relinquish his citizenship when he joined the Knesset; the Board therefore held that Kahane had expatriated himself. In this action, Kahane challenges the Board's determination, which is subject to *de novo* review, 8 U.S.C. § 1503(a); *see Richards v. Secretary of State*, 752 F.2d 1413, 1417 (9th Cir.1985); Note, *United States Loss of Citizenship After Terrazas: Decisions of the Board of Appellate Review*, 16 N.Y. U.J. Int'l L. & Pol. 829, 844 (1984) ("NYU Note"). The parties have cross-moved for summary judgment, Fed.R.Civ.P. 56, and, for the reasons that follow, the government's motion is denied and Kahane's motion is granted.

### I. *Background*

Kahane became an American citizen by virtue of his birth in New York City on August 1, 1932. He took up permanent residence in Israel in September 1971 and, in December 1972, he became a citizen of Israel by operation of that country's Law of Return. The administrative record indicates that the Law of Return operated automatically to confer Israeli citizenship on Kahane, and the government does not contend that Kahane's dual citizenship is a ground for expatriation. Defendants' Memorandum of Law in Support of their Motion for Summary Judgment and Judgment on the Pleadings at 31 n. 19; *see* NYU Note, *supra*, at 861 n. 225 ("[T]he dual citizenship conferred upon American Jews under the Israeli Law of Return will normally not affect U.S. citizenship because it is presumed that Israeli citizenship is accepted without the intent to relinquish U.S. citizenship.").

Since becoming a resident of Israel, Kahane has participated vigorously in that

nation's political life. He founded the Kach Party and has run at the head of its ticket in parliamentary elections. Under Israeli's system of proportional representation, the Kach Party received insufficient votes to garner even one seat in the Knesset following the elections of 1973, 1977, and 1981. In 1984, however, Kach received sufficient votes to seat one candidate, and Kahane took that seat on August 13. On the same day, Edward A. Betancourt of the State Department wrote to one of Kahane's attorneys, Barry Ivan Slotnick, stating that Kahane had performed a potentially expatriating act and reminding Slotnick of Kahane's right to submit evidence "regarding his ... intent toward U.S. citizenship at the time of the [expatriating] act and any other information believed relevant." On September 10, 1984, Kahane wrote to Ray E. Clore, the United States Consul in Jerusalem, and enclosed a partially completed questionnaire entitled "Information for Determining U.S. Citizenship." In responding to the questionnaire, Kahane reiterated his understanding that he did not intend to relinquish American citizenship when he took a seat in the Knesset. His cover letter to Clore expressed his displeasure with the State Department's inquiries and concluded: "Now, stop bothering me." Clore signed a Certificate of Loss of Nationality of the United States ("CLN") with regard to Kahane on December 18, 1984. *See* 8 U.S.C. § 1501. The CLN was approved on October 2, 1985 by Carmen A. DiPlacido, Director of the Office of Citizens [*sic*] Consular Services in the Bureau of Consular Affairs of the State Department.

Kahane appealed to the Board of Appellate Review on October 11, 1985 and commenced this action on October 18, 1985. The action was stayed pending disposition by the Board. The Board rejected Kahane's argument that the question of his intent was controlled by statements that he and his attorney had made, before and after his seating in the Knesset, to the effect that he did not intend to relinquish his citizenship. Finding that Kahane had expatriated himself, the Board characterized his argument as leading "to the anomalous

result ... that the government would be foreclosed (except perhaps where perjury could be proved) from making a determination of loss of nationality simply because a citizen says at the crucial time he did not intend to relinquish citizenship." *In re Kahane*, slip op. at 8 (Dep't of State Bd. of App.Rev. May 1, 1986). The Board distinguished its prior decision that another member of the Knesset had not expatriated herself:

> M.F. had gained her seat in the Knesset only because the Civil Rights party had won an unexpected number of seats, she being third on the list of candidates; M.F. appeared rarely in the Knesset and when she did, was mainly active on women's rights issues; she did not involve herself in the broader political issues in Israel.

*Id.* at 12 (citing *In re M.F.* (Dep't of State Bd. of App.Rev. Jan. 29, 1982)). The Board summarized the evidence regarding Kahane that manifested, in its view, "a commitment to and involvement in the public affairs of Israel that transcend mere empathy and a disposition to support a friendly foreign state." *Id.* at 13. The Board stated:

> Rabbi Kahane long ago became a citizen of Israel. He has served in the armed forces of Israel. His taking a seat in the Knesset climaxed fourteen years of political activism characterized by a professed ambition to change the social and political land scape [*sic*] of Israel. Shortly after arriving in Israel he founded a political party, and beginning in 1973 he ran for the Knesset in every national election. Before he was finally elected to the Knesset, Rabbi Kahane attempted, through speeches and public manifestations, to influence the direction of government policies and programs. Upon election in 1984, he took a seat in the Knesset, the supreme authority in the Israeli governmental structure. He made a declaration of allegiance to Israel, as required by law, at the first session of the Knesset, pledging to be faithful to the State of Israel and to

serve faithfully in the Knesset. Entering the Knesset was, by his own admission, one more step along the road he has travelled to make Israel his "permanent home." As leader of a political party, Rabbi Kahane enjoys a status and influence in the Knesset greater than that of an ordinary member. He has made himself a factor in Israeli politics, arguably a formidable one, and aspires to become Prime Minister as he told a National Press Club audience in Washington, D.C. on September 12, 1985.

*Id.*

## II. *Facts*

Each side points to specific facts in the record in support of its motion for summary judgment. Kahane emphasizes his continuing ties to the United States, as manifested, for instance, by his decision to remain the head of the Jewish Defense League ("J.D.L."), an organization he had founded in 1968, for more than one year following his seating in the Knesset. A State Department telegram of October 4, 1972 recorded Kahane's intent to retain his American citizenship even while running for the Knesset (R3).[1] On the questionnaire he filled out, Kahane noted that he retained a residence in the United States, filed United States income tax returns, and spent one-third of each year in the United States (R95). Kahane continued to utilize a United States passport (R36, 51). Kahane's wife and four children, all born in the United States, have been registered with the United States Consul General in Jerusalem since 1972 (R65).

In addition to his vigorous litigation of the question of his citizenship, Kahane has made a series of statements expressing his intent to remain an American citizen. Upon his conscription by the Israel Defense Force in 1979, Kahane filed an affidavit indicating that he did not wish to relinquish his American citizenship and that he would not have joined the IDF had he not been conscripted (R34). The United States Con-

sul determined that there was insufficient evidence to show an intent to relinquish citizenship and approved Kahane's application for documentation as a United States citizen (R35). On August 1, 1984, after Kahane had been elected to the Knesset but twelve days before he was seated, his attorney Slotnick wrote to the State Department "to reassert [Kahane's] ... firm resolve ... to remain a national of the United States" (R45). The key paragraph of the letter stated:

I therefore reiterate that Citizen Kahane has never intended nor does he ever intend to relinquish voluntarily his valued status as a national of the United States of America. His compaign [*sic*] for and election to the Israeli Knesset is a wholly separate act, totally unrelated to and independent of his role as a United States citizen [R44].

Kahane sent his own letter to Alan Romberg of the State Department on August 8, 1984. The letter was typewritten on Kach Party stationery, and its body was as follows:

Your gratuitous remarks of July 26th concerning my possible loss of citizenship point up an intolerable political interference in the rule of Law [*sic*]. When Mr. Moshe Arens, a U.S. citizen at the time, was elected to the Knesset, no such statement was made by the Administration at that time. It is clear that it is not the law but, rather [*sic*] my politics, that disturbs the present Administration.

In any event, I take this opportunity to inform you that my election to the Knesset and my taking of my seat there were undertaken without the slightest intent of relinquishing my U.S. citizenship, a necessary precedent to any loss of that citizenship.

I greatly value my U.S. citizenship and have no intention of relinquishing it. Hopefully, the State Department will honor the rule of Law that is the corner-

---

1. Numerals preceded by "R" are references to Kahane's Passport/Citizenship file, which was the record used by the State Department's Board of Appellate Review.

stone of the greatness that is the United States [R46].[2]

On September 10, 1984, after Kahane took his seat in the Knesset, he filled out the questionnaire previously discussed. Question 13 asked: "Did you know that by performing the [*sic*] act described in item 7 above you might lose U.S. citizenship? Explain your answer." Kahane replied: "I knew that I would *NOT* lose my citizenship since I had no intention of relinquishing it and so informed the State Dept before taking my seat in Knesset" (R95). On August 1, 1985, Kahane wrote to the State Department, on Knesset stationery, about a bill proposed in the Knesset requiring dual citizens who belonged to that body to relinquish their non-Israeli citizenship. Kahane stated his opposition to the legislation and added: "I wish to remain a U.S. citizen and believe that only the United States government has the right in whatever manner the U.S. courts decide to deprive a U.S. citizen of his citizenship" (R67).

For its part, the government concentrates on other elements of the fact pattern. According to the government, these elements demonstrate that Kahane was disingenuous when he said that the expatriating act—joining the Knesset—was committed without intent to relinquish United States citizenship. In essence, the government contends that Kahane's words and deeds demonstrate that he no longer considers himself an American citizen.

Thus, the government notes Kahane's repeated desire to become Prime Minister of Israel. Address by Meir Kahane, National Press Club 11 (Sept. 12, 1985) ("NPC Address").[3] The government also cites an excerpt from a book by Kahane:

From the beginning, my concept of the [J.D.L.] was an organization that would ... call for the Jew to go live in Israel. The need to return to Zion was born for positive reasons—Israel was his home, the place where he could live as a majori-

ty, with Jewish sovereignty and thus create a Jewish state that was Jewish in character, culture, and practice—and for negative reasons—the Jew could never find peace in exile as a stranger and a minority person who was hated for his success or despised for his failure. Israel was the true, final solution.... For me, J.D.L. had to preach the idea of *aliyah*, of return home....

M. Kahane, The Story of the Jewish Defense League 228–29 (1975). In further support of its argument that Kahane deems Israel his only country, the government cites the following question by a reporter and Kahane's answer:

Q: You say, "I have only one country" and yet you are striving to keep your American citizenship. How do you justify this apparent contradiction?

A: It is apparent. I'm a dual citizen. I live in—in Israel. I believe that a person should not be a dual citizen. And I would have long since given it up if I did not fear—and with justification—that if I gave it up, the American government would place great obstacles in—in my path in attempting to obtain a visa to enter America for lecture tours. I have a great deal to say to Jews in this country. I want to save them from their Jewish leaders. I want to say things that they don't hear. I want to warn them, for example, of a possible tragedy that could happen to the American Jew here. And not to fall prey to this nonsense "it couldn't happen here." God forbid there would be a terrible economic crash in this country—a very, very bad one. A severe one. And certainly one who is honest enough to look at the economic truth of a country which is approaching the $2 trillion national debt, whose banking system is beset with all kinds of not bad debts—impossible debts. I don't know what would happen here.

**2.** This August 8 letter referred to Kahane's taking a seat in the Knesset in the past tense. In reality, the first session of the Knesset to which Kahane had been elected was held on August 13.

**3.** The NPC Address was broadcast by National Public Radio. A transcript of the speech has been appended to the administrative record.

The Germans were not evil people; they weren't devils. They were as decent or indecent as anyone else. And they chose Hitler because of a terrible crash, an economic crash, the unraveling of the social fabric. I am afraid for Jews. I want them to live in Israel. At least I want them to think about this. I want them to stop thinking that when they go to a dinner of the National Conference of Christians and Jews that's where to hear the truth about what people think about Jews. That's not true. If I had my way, I would compel every Jewish leader in Washington to go to a bar every night for a week—not a trendy bar—a bar. And listen as the whiskey goes in what sometimes comes out.

That's the only reason why I haven't given up the citizenship. However, there is a bill in Kinesset [*sic*] by my enemies which will force me, when it passes— which will probably be sometime in the fall—to give it up. And at that time I will. And hopefully, the American government will allow me in.

NPC Address at 16–18.

Since Kahane has moved to Israel, the government points out, he has been deeply involved in Israeli politics. Certain of his activities have resulted in arrests and convictions. When an American consular officer visited Kahane to ask whether he had been mistreated in jail, Kahane once answered: "What do you expect? That I should complain about my country to you people?" (R63). When Kahane took his seat in the Knesset, he was required to take an oath reading: "I pledge to be faithful to the State of Israel and serve faithfully my mission at the Knesset" (R86).[4] Finally, the government points to Kahane's frequent use, in the NPC Address, of "us"

to refer to Israel and "they" to refer to the United States, as well as his statement, referring to Israel, "I have only one country," NPC Address at 9.[5]

The court's task is to determine the legal consequences of all the facts recounted. For the reasons that follow, the court concludes that the facts are consistent with only one determination: that Kahane did not intend to relinquish his citizenship when he committed an expatriating act.

### III. *Discussion*

In *Afroyim v. Rusk*, 387 U.S. 253, 87 S.Ct. 1660, 18 L.Ed.2d 757 (1967), the Court overruled *Perez v. Brownell*, 356 U.S. 44, 78 S.Ct. 568, 2 L.Ed.2d 603 (1958), and rejected the latter's idea "that, aside from the Fourteenth Amendment, Congress has any general power, express or implied, to take away an American citizen's citizenship without his assent," 387 U.S. at 257, 87 S.Ct. at 1662. *Afroyim* quoted from the fourteenth amendment: "All persons born or naturalized in the United States ... are citizens of the United States ...," *id.* at 262, 87 S.Ct. at 1665, and commented:

> There is no indication in these words of a fleeting citizenship, good at the moment it is acquired but subject to destruction by the Government at any time. Rather the Amendment can most reasonably be read as defining a citizenship which a citizen keeps unless he voluntarily relinquishes it. Once acquired, this Fourteenth Amendment citizenship was not to be shifted, canceled, or diluted at the will of the Federal Government, the States, or any other governmental unit.

*Id.*

In light of its reading of the language and history of the fourteenth amendment, the Court concluded:

---

4. There is some dispute about whether Kahane ever answered the request that he take this oath. The required answer was "I pledge" (R86), but in an amusing colloquy, Kahane sought to avoid using the requisite language (R81–85). The Chairman of the Knesset ultimately determined that Kahane had stated the requisite words (R81) and, for purposes of this action, the court shall assume that Kahane said "I pledge."

5. In context, the statement "I have only one country" was a reference to the exclusivity of Israel as a Jewish state, in comparison to twenty-two Arab states. Kahane's words were: "I make absolutely no apologies for the fact that I am not prepared to lose my country either to Arab bullets or to Arab babies. They have 22 countries, and I wish them well. I truly do. But I have only one country, and I will not lose that country—in any way." NPC Address at 9.

We hold that the Fourteenth Amendment was designed to, and does, protect every citizen of this Nation against a congressional forcible destruction of his citizenship, whatever his creed, color, or race. Our holding does no more than to give to this citizen that which is his own, a constitutional right to remain a citizen in a free country unless he voluntarily relinquishes that citizenship.

*Id.* at 268, 87 S.Ct. at 1668.

In *Vance v. Terrazas*, 444 U.S. 252, 100 S.Ct. 540, 62 L.Ed.2d 461 (1980), the government tried to persuade the Court that some voluntary acts are so inconsistent with retention of American citizenship that they may result, automatically, in loss of nationality. *See id.* at 258–59, 100 S.Ct. at 544. The Court's short answer to that theory was, "We disagree." *Id.* at 259, 100 S.Ct. at 544. Noting that *Afroyim* had required an element of "assent," *Terrazas* remarked: "It is difficult to understand that 'assent' to loss of citizenship would mean anything less than an intent to relinquish citizenship, whether the intent is expressed in words or is found as a fair inference from proved conduct," *id.* at 260, 100 S.Ct. at 545. "In the last analysis, expatriation depends on the will of the citizen rather than on the will of Congress and its assessment of his conduct." *Id.*

After the Court stated its adherence to *Afroyim's* intent requirement, it discussed the applicable standard of proof in expatriation proceedings. The *Terrazas* Court concluded that it was sufficient for the government to prove an expatriating act and intent to relinquish citizenship by a preponderance of the evidence, *id.* at 270, 100 S.Ct. at 550, as provided by statute, rather than by clear and convincing evidence, as the court of appeals had required, *see id.* at 264, 100 S.Ct. at 547. The Court also held that it was constitutional to pre-

sume that an expatriating act was committed voluntarily and to shift the burden of proof on intent to the citizen. *Id.* at 270, 100 S.Ct. at 550.[6]

On remand of *Terrazas*, the district court reinstated its earlier judgment in favor of the government, finding that plaintiff's intent to relinquish his American citizenship had been demonstrated by nearly overwhelming evidence. *Terrazas v. Muskie*, 494 F.Supp. 1017, 1020 (N.D.Ill.1980). In affirming, the court of appeals observed that "a party's intent to relinquish his citizenship rarely will be established by direct evidence. But, circumstantial evidence surrounding the commission of a voluntary act of expatriation may establish the requisite intent to relinquish citizenship." *Terrazas v. Haig*, 653 F.2d 285, 288 (7th Cir.1981) (per curiam).

The Ninth Circuit construed *Terrazas* in *Richards v. Secretary of State*, 752 F.2d 1413 (9th Cir.1985). Discussing the statutory expatriating acts, *Terrazas* had said: " 'Of course,' any of the specified acts 'may be highly persuasive evidence in the particular case of a purpose to abandon citizenship.' " 444 U.S. at 261, 100 S.Ct. 545 (quoting *Nishikawa v. Dulles*, 356 U.S. 129, 139, 78 S.Ct. 612, 618, 2 L.Ed.2d 659 (1958) (Black, J., concurring)). In apparent reliance on this passage, the *Richards* court opined: "Some expatriating acts may be so inherently inconsistent with United States citizenship that persons performing them may be deemed to intend to relinquish their United States citizenship even in the absence of statements that they so intended the acts, or, indeed, even despite contemporaneous denials that they so intended the acts." 752 F.2d at 1420 n. 5. The court explained that this view was not inconsistent with *Afroyim's* teaching that expatriating acts, standing alone, are insuf-

---

**6.** Although three justices disagreed with the Court's evidentiary rulings, *see* 444 U.S. at 271, 100 S.Ct. at 550 (Marshall, J., concurring in part and dissenting in part) (rejecting preponderance standard); *id.* at 273, 100 S.Ct. at 551 (Stevens, J., concurring in part and dissenting in part) (same); *id.* at 274, 100 S.Ct. at 552 (Brennan, J., dissenting) (no loss of citizenship without for-

mal renunciation); *cf. id.* at 270, 100 S.Ct. at 550 (Stewart, J., dissenting) (joining Part II of Justice Brennan's dissent, which argued that oath of allegiance to country of which one had been citizen was not inconsistent with United States citizenship), all nine justices agreed that citizenship could not be lost unless the actor intended to relinquish his citizenship.

ficient to result in loss of citizenship: "although performing the act could itself result in loss of citizenship, that would be a consequence of the inherent nature of the act, not the fact that Congress has designated it an expatriating act." *Id.* This reading of *Terrazas* is questionable. *Terrazas* rejected the government's argument that some acts are so inconsistent with retention of citizenship that Congress may accord those acts their natural consequences: loss of nationality. *See* 444 U.S. at 258–59, 100 S.Ct. at 544.

This court would be reluctant to hold that any act, standing alone, conclusively bespeaks its intent. Recognizing the unpredictability of human behavior and its limitless vagaries, the possibility that such a case may arise may be conceded. Another court, on another day, may be called upon to evaluate the intent behind an act "inherently inconsistent" with citizenship, especially if that act is accompanied by contemporaneous protestations that by committing it, the actor does not intend to relinquish his citizenship. This is not such a case. If the act stands alone, with no proof of intent adduced by either side, a court may conclude that the preponderance of the evidence shows an intent to relinquish citizenship. When the act is accompanied by evidence of intent, either direct or circumstantial, the situation seems to this court somewhat different. Since citizenship is "beyond the power of any governmental unit to destroy," *Afroyim, supra,* 387 U.S. at 263, 87 S.Ct. at 1665, it may well be that a declaration of intent to retain citizenship, made simultaneously with commission of the expatriating act, will suffice to preserve the actor's citizenship.[7]

Notwithstanding this court's reservations about *Richards,* the issue discussed in footnote 5 of that case is not presented here, because Kahane's act—taking a seat in the Israeli Knesset—is not "inherently inconsistent" with American citizenship. The State Department acknowledged the compatibility of American citizenship and membership in the Knesset in the case of M.F. *Richards* is, in any event, plainly distinguishable on its facts. The Ninth Circuit there held only that "the voluntary taking of a formal oath that includes an *explicit renunciation of United States citizenship* is ordinarily sufficient to establish a specific intent to renounce United States citizenship." 752 F.2d at 1421 (emphasis added).

Here, the acts and statements of Kahane that he emphasizes show beyond doubt that he wanted very much to remain an American citizen. This intent was manifested both before and after he joined the Knesset. Of course, the issue is what Kahane intended at the moment he committed the expatriating act, but his conduct before and after the act, especially the conduct closest in time to the act, is so probative of his intent that a trial would be superfluous. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is 'no genuine issue for trial.'" *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* — U.S. ——, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968)); *cf. Knight v. U.S. Fire Insurance Co.,* 804 F.2d 9, 12 (2d Cir.1986) (en-

---

**7.** The government analogizes intent to relinquish citizenship to intent to commit a crime. Concededly, intent is a necessary element of criminal conviction, and yet a person may be convicted of a crime even though he stated, while committing the crime, that he had no intent to do so. Nevertheless, the court finds the analogy unsatisfying. It is possible—indeed, likely—for a criminal to lie about his intent, because he wishes to avoid punishment. Thus, he misrepresents what he intended to do to his victim, if he is a murderer, or to the communi-

ty, if he is a tax evader. But an actor who states that he wishes to remain a citizen is making a statement about *his own status.* In this context, it may be impossible to "tell a lie," just as a voter who registers with the Democratic Party despite his Republican sympathies *is* a Democrat. This court is inclined to believe that the statement "I wish to remain a citizen" cannot be a "lie" and that an actor who made the declaration contemporaneously with the expatriating act would automatically preserve his citizenship.

couraging filing of justifiable motions for summary judgment).

 The evidence that the government emphasizes does nothing to shake the conclusion that Kahane intended to retain his American citizenship. When Kahane said that he did not believe a person should be a dual citizen, it was immediately after he stated that he was such a person. Kahane's exhortations should not be confused with his conduct. While he wants his fellow Jews to move to Israel, he is also obviously keen to retain the options and benefits guaranteed by American citizenship. The government finds Kahane's motive—a desire to use citizenship as no more than a "boarding pass" to the United States—less than commendable. But motive should never be confused with intent. Indeed, the strength of Kahane's motive supports the conclusion that his intent is unmistakable. The government's burden is to prove that Kahane intended to relinquish American citizenship. The most it can prove, instead, is that Kahane is a hypocrite, for telling people that they should do as he says and not as he does. *Afroyim* and *Terrazas* teach that an intent to retain citizenship for hypocritical or cynical reasons is no less valid—legally—than an intent predicated on the noblest of altruistic motives. Because there is no genuine issue of material fact with regard to Kahane's intent, his motion for summary judgment is granted and the government's motion for summary judgment and judgment on the pleadings is denied.

SO ORDERED.