MATTER OF C—S—

In DEPORTATION Proceedings

A–12269404

*Board Decisions December 26, 1961, and March 7, 1962*
*Decided by Attorney General May 24, 1962*

Expatriation—Section 349(a)(5)—Voting in foreign election while unaware of
United States citizenship.

(1) A native of Cuba who acquired United States citizenship at birth in 1933
through his father and who resided in Cuba until 1960 did not become ex-
patriated when he voted in a Cuban political election in 1958 while unaware
of his United States citizenship.

(2) The presumption contained in section 349(b) of the 1952 Act is addressed
only to the question whether the asserted act of expatriation was commit-
ted voluntarily or under duress, and has no application to acts which were
performed voluntarily but without knowledge of United States citizenship.

CHARGE:

Order: Act of 1952—Section 241(a)(1) [8 U.S.C. 1251(a)(1)]—Excludable
at time of entry—No valid visa.

**BEFORE THE BOARD**
(December 26, 1961)

**DISCUSSION:** The special inquiry officer terminated proceedings
and ordered the case certified to the Board for final decision. Brief
has been submitted by the examining officer requesting that the re-
spondent be ordered deported.

The issue is one of alienage. The respondent claims that he was a
United States citizen at birth. The Service does not contest the
possibility but argues that citizenship was lost when the respondent
voted in a political election in Cuba. The respondent was born on
May 31, 1933, in Cuba. His father was born in the United States.
The respondent's mother was born in Cuba. The respondent's fa-
ther lived in the United States for about a year after birth and then
was taken to Cuba. He died when the respondent was four years
of age. There is no evidence that he had lost United States nation-
ality prior to the birth of the respondent. It appears that the re-
spondent had a colorable claim to United States citizenship at birth

670

under section 1993 of the Revised Statutes (see, *Matter of L—G—J— and C—I—P—*, 3—206).

The respondent's uncontradicted testimony, accepted by the special inquiry officer, was that he voted in an election in Cuba on November 3, 1958, when his father-in-law, the mayor of the city, was running for the national senate of Cuba; that prior to October 1959, he had made an application for a visa to come to the United States for permanent residence; that he received a letter with instructions telling him that if he considered himself an American citizen he should not apply for a visa; that in October 1959, in connection with an application he had made for a visa, he learned for the first time that he had a possible claim to American citizenship by birth. The special inquiry officer was of the belief that *Rogers v. Patokoski*, 271 F.2d 858 (C.A. 9, 1959), required a decision in favor of the respondent because the respondent had no knowledge that he had a claim to United States citizenship when he voted. The examining officer, in a capable brief, raises a question as to the applicability of *Patokoski* because of his belief that section 349(b) of the Immigration and Nationality Act (8 U.S.C. 1481) raises a conclusive presumption that the act of expatriation was voluntary.

In *Matter of C—A—*, 9—482 (Oct. 17, 1961), which was decided subsequent to the decision of the special inquiry officer in the instant case, we held, on the basis of *Patokoski* and other cases there mentioned, that a citizen of the United States could not lose United States citizenship by committing an act which would otherwise be the basis for a loss of citizenship, if, at the time the act was committed, he had no knowledge that he had a claim to United States citizenship.

The respondent's expatriation is alleged to have occurred under section 349(a)(5) of the Immigration and Nationality Act (8 U.S.C. 1481) which provides for loss of citizenship by voting in a political election in a foreign state. Section 349(b) of the Immigration and Nationality Act (8 U.S.C. 1481) provides as follows:

Any person who commits or performs any act specified in subsection (a) of this section shall be conclusively presumed to have done so voluntarily and without having been subjected to duress of any kind, if such person at the time of the act was a national of the state in which the act was performed and had been physically present in such state for a period or periods totaling ten years or more immediately prior to such act.

Despite the existence of section 349(b), we have found that an act which would otherwise accomplish expatriation will not do so if the act was done in the belief that a claim to United States citizenship does not exist and such belief is based on the claim of a responsible United States official (*Matter of S—*, 8—266; *Matter of S—*, 8—221). Here too where action was taken without knowledge that United

States citizenship existed, the circumstances under which the presumption was intended to operate do not exist. The record fails to establish that the respondent is an alien. Termination of proceedings is proper.

**ORDER:** It is ordered that proceedings be and the same are hereby terminated.

### BEFORE THE BOARD
### (March 7, 1962)

**DISCUSSION:** On December 26, 1961, the Board ordered proceedings terminated. The Service now moves that the Board withdraw its order and enter one of deportation on the charge stated above. Respondent has submitted a letter asking that no change be made in the Board's order. The motion will be denied.

The facts have been fully stated in the Board's previous order. Respondent, a native of Cuba, became a United States citizen at birth. He was physically present in Cuba for a period of ten years or more prior to voting there in a political election in 1958. At the time he voted, he did not know that he was a citizen of the United States. The issue is whether he lost United States citizenship under section 349(a)(5) of the Act, 8 U.S.C. 1481(a)(5).[1]

The Board's order of termination is based upon *Matter of C—A—*, 9—482, holding that a United States citizen did not expatriate himself by committing an act which would normally result in loss of United States citizenship, if, at the time the act was committed, he did not know that he was a United States citizen. *Matter of C—A*, *supra*, is based upon *Rogers* v. *Patokoski*, 271 F.2d 858 (C.A. 9, 1959), which holds that one who committed acts of an expatriating nature without knowledge of his United States citizenship did so involuntarily. As we read the motion, it does not take issue with *Matter of C—A—* or *Patokoski*, but attempts to distinguish each from the case before us on the ground that section 349(b) of the Act did not apply to either but does here and establishes a conclusive presumption that the voting was voluntary. We agree that section 349(b) of the Act could not have been applied in either *Patokoski* or *Matter of C —A—;* however, we find that the section does not apply to the instant situation.[2] Therefore, the rule stated in the two precedents controls here.

---

[1] Section 349(a)(5) of the Act provides that "a person who is a national of the United States whether by birth or naturalization, shall lose his nationality by * * * voting in a political election in a foreign state or participating in an election or plebiscite to determine the sovereignty over foreign territory."

[2] Section 349(b) of the Act is prospective only and therefore did not apply to Patokoski's conduct which occurred prior to the effective date of the Act (foreign army service 1941–44, voting 1946). C—A—'s conduct is made a ground for loss of citizenship under section 350 of the Act, whereas section 349(b) by its terms applies only to conduct found in section 349(a) of the Act.

Section 349(b) of the Act (8 U.S.C. 1481(b)) provides:

Any person who commits or performs any act specified in subsection (a) shall be conclusively presumed to have done so voluntarily and without having been subjected to duress of any kind, if such person at the time of the act was a national of the state in which the act was performed and had been physically present in such state for a period or periods totaling ten years or more immediately prior to such act.

We have held that where section 349(b) of the Act is applicable, it prevents inquiry into the voluntariness of an act of expatriation (*Matter of M—G—*, 7—665).[3] However, we have concluded that section 349(b) of the Act was not meant to apply where the act of expatriation followed erroneous advice of a United States official (*Matter of S—*, 8—221; *Matter of S—*, 8—226). The Service has not contested this distinction in the past (*Matter of P—*, 8—307), nor do we understand the present motion to take issue with the distinction. While it is clear that respondent's conduct was not based on erroneous official advice, his situation and that where action was based on erroneous official advice are similar in that duress is not an element in either instance. It appears to us that section 349(b) of the Act requires a distinction to be made between situations in which duress can be offered as a defense and situations in which duress is not an element and that section 349(b) of the Act has no application to the latter situations. The pertinent words in section 349(b) of the Act are "to have done so voluntarily and without having been subjected to duress of any kind." The general words "to have done so voluntarily," in our opinion, are limited and qualified by the special words following (2 Sutherland, *Statutory Construction*, sec. 4908 (3d ed., 1943)). We believe this is so because there is no legislative expression of an intent that an act of expatriatory force performed by a dual national with the necessary residence should be considered a voluntary act under all circumstances, and that the fact that Congress made express provision for the loss of nationality by dual nationals in section 350 of the Act, 8 U.S.C. 1482, expressly providing that loss of citizenship could not result except by voluntary action.[4] Further

---

[3] The nature of the duress is not shown in *Matter of M—G—*, *supra;* however, the order of November 12, 1957, referred to in the case, revealed that duress was found in the fact that M—G— believed she was required to vote under the laws of Mexico.

[4] Examination of the legislative history fails to reveal any clue as to the Congressional intent in regard to section 349(b) of the Act. The Senate Committee which investigated the immigration system and made conclusions upon which the Act is based, recommended only that there be a conclusive presumption that one who took an oath to hold employment with a foreign government, did take such an oath, and that there should be a presumption that an alien who departed from the United States and failed to comply with the provision of the compulsory service law departed for the purpose of avoiding

654377—63——44

factors considered are the unusual nature of the presumption and the fact that ambiguity should be resolved in favor of retention of United States citizenship. We conclude that section 349(b) of the Act is applicable only in situations where duress could have been offered as a defense. In the instant case, duress, is not involved; section 349(b) is, therefore, not applicable.

It is the Service view that section 349(b) of the Act became law with Congressional knowledge of decisions of the courts which allegedly preclude the possibility of exempting a person who committed an act of expatriation without knowing that he was a United States citizen. Cases cited express the view that an intent to expatriate is not necessary to bring about expatriation.[5] However, these cases unlike the one before us, involve action by persons who knew they were citizens of the United States when the action took place, and the latest court to consider the type of situation before us stated that knowledge of the existence of United States citizenship must exist before a person can voluntarily expatriate himself (*Rogers* v. *Patokoski, supra*). We believe we are bound to follow this ruling.

It is the Service belief that Congressional expressions of desire to be relieved of problems arising out of dual nationality require the finding that section 349(b) of the Act applies here. We believe the Service reads too much in the fact that Congress expressed its concern with problems arising out of dual nationality. As we have

---

service in the armed forces (S. Rept. No. 1515, 81st Cong., 2d Sess., pp. 749–52, 766–69). The Committee report which accompanied S.2550 restates the second recommendation (S. Rept. No. 1137, 82d Cong., 2d Sess., pp. 46–47, 49). The conference report on the bill which became the Immigration and Nationality Act offers no help (H. Rept. No. 2096, 82d Cong., 2d Sess., pp. 127–29). We are unaware that debate on the bills which became the Immigration and Nationality Act sheds any light upon the intent of Congress in providing for the conclusive presumption (for history of law see Besterman, Commentary, 8 U.S.C.A., Vol. 1, p. 4).

[5] Section 349(b) of the Act had no counterpart in previous legislation. Section 401(a) of the Act of 1940 did establish the presumption that a United States citizen who acquired foreign nationality through the naturalization of his parents and who failed to return to the United States by January 13, 1943, would be deemed to have elected to discontinue his status as a United States citizen. In interpreting section 401(a) of the Act of 1940, the courts found no expatriation had occurred where the individual's failure to come to the United States was due to circumstances beyond his control (*Perri* v. *Dulles*, 230 F.2d 259 (C.A. 3, 1956)) or where the failure to come in time was the result of mistake which stemmed from erroneous information supplied by officials of the United States (*Rueff* v. *Brownell*, 116 F. Supp. 298 (D.C. N.J., 1953)). And, the court held that the period which one had to return to the United States did not begin until the individual learned that he had a right to United States citizenship (*Petition of Acchione*, 213 F.2d 845 (C.A. 3, 1954)).

pointed out, Congress provided grounds of expatriation for dual nationals which are not applicable to a United States citizen without dual nationality (section 350 of the Act, 8 U.S.C. 1482) and by a conclusive presumption prevented certain dual nationals from raising a defense available to other dual nationals and to United States citizens without dual nationality. However, Congress made no effort to eliminate the concept of dual nationality. It would be highly improper to deprive the respondent of a possible defense merely because he is a dual national.

The Service expresses the belief that section 349(c) of the Act, 8 U.S.C. 1481(c), which places the burden of proof in expatriation cases on the one who raises the involuntary nature of conduct as a defense, is pertinent in determining the Congressional purpose in establishing section 349(b) of the Act. Section 349(c) of the Act merely relates to burden of proof and is applicable only when action has been started after September 26, 1961. We fail to see its relation to the problem before us or how it assists in determining Congressional intent in enacting section 349(b) (H. Rept. No. 1086, 87th Cong., 1st Sess., pp. 40–41).

Finding that section 349(b) of the Act does not prevent establishing that an act of expatriation was committed without knowledge of the existence of United States citizenship, and finding that the establishment of such a fact precludes the conclusion that expatriation resulted, we believe that proceedings are properly terminated.

**ORDER:** It is ordered that the motion be and the same is hereby denied.

## BEFORE THE ATTORNEY GENERAL
### (May 24, 1962)

The Board of Immigration Appeals, pursuant to 8 CFR 3.1(h)(1)(iii), has, at the request of the Commissioner of Immigration and Naturalization, referred its decision in this case to me for review. The issue is one of expatriation. The Board, in agreement with the special inquiry officer, ordered termination of the proceedings to deport the respondent on the ground that he did not have a visa at the time he entered the United States in October 1960, holding that the record failed to establish that he is an alien. The Board's view is that an act of expatriation has no effect if at the time the act took place the individual did not know he was a citizen of the United States. The Commissioner disagrees and points out that the view of the Department of State is likewise contrary to that expressed by the Board.

The facts are not in dispute. The respondent who was born in Cuba on May 31, 1933, acquired United States citizenship upon his birth through the citizenship of his father. R.S. § 1993. The father

died when respondent was 4 years old and respondent did not know of his citizenship until many years later, in 1959. He had resided in Cuba continuously until he entered the United States in October 1960. On November 3, 1958, while unaware of his United States citizenship, respondent voted in a Cuban political election.

Under the provisions of section 349(a)(5) of the Immigration and Nationality Act of 1952 (8 U.S.C. 1481(a)(5)), a person "who is a national of the United States whether by birth or naturalization, shall lose his nationality by . . . voting in a political election in a foreign state or participating in an election or plebiscite to determine the sovereignty over foreign territory . . ." Section 349(b) provides that a person who commits any act specified in subsection (a) "shall be conclusively presumed to have done so voluntarily and without having been subjected to duress of any kind, if such person at the time of the act was a national of the state in which the act was performed and had been physically present in such state for a period or periods totaling ten years or more immediately prior to such act."

The Board of Immigration Appeals relied on *Rogers* v. *Patokoski*, 271 F.2d 858 (C.A. 9, 1959), which holds, on facts closely similar to those of the present case, that voluntary acts abroad of voting and serving in the armed forces of a foreign country did not result in expatriation where the individual was unaware of his United States citizenship. The same rule was applied by the Board in *Matter of C—A—*, 9—482 (1961). Compare, *Perri* v. *Dulles*, 206 F. 2d 586, 591 (C.A. 3, 1953), and *Petition of Acchione*, 213 F.2d 845 (C.A. 3, 1954), holding that the two-year period established by section 401(a) of the Nationality Act of 1940, 54 Stat. 1168, during which a dual national must return to the United States or forfeit his American citizenship, did not begin to run until he became aware of his United States citizenship.

The *Patokoski* case arose under the expatriation provisions of section 401(a) of the Nationality Act of 1940, which did not contain the statutory presumption established by section 349(b) of the 1952 Act quoted above. That presumption is in terms addressed only to the question whether the asserted act of expatriation was committed voluntarily or under duress. Hence, it has no application to a case such as the present in which the acts were performed voluntarily but without knowledge of the individual's United States citizenship.

The Supreme Court has emphasized that, where deprivation of the "precious right of citizenship" is involved, "the facts and the law should be construed as far as is reasonably possible in favor of the citizen." *Nishikawa* v. *Dulles*, 356 U.S. 129, 134 (1958). In the

676

absence of clear and compelling statutory language, I am unwilling to attribute to Congress an intention that the United States citizenship of an individual should be forfeited by reason of actions taken at a time when he was unaware of his citizenship.

The decision of the Board of Immigration Appeals is approved.